**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 21, 2009

Charles R. Fulbruge III
Clerk

No. 08-40704

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

JUAN CARLOS VARGAS

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, SMITH, and SOUTHWICK, Circuit Judges.

PATRICK E. HIGGINBOTHAM:

At 11:15 p.m. on December 2, 2007 defendant Juan Carlos Vargas drove a tractor trailer into the United States Border Patrol Checkpoint in Sarita, Texas. Vargas owned the tractor, which he leased to his employer, P&M Trucking. Enrique Garza owned the trailer. Border patrol agents opened the trailer and found 1,426 pounds of marijuana buried under bales of used clothing. Vargas was convicted of possession with intent to distribute more than 100 kilograms of marijuana. He appeals, asserting prosecutorial misconduct during the government's closing argument.

I

The jury hung in the first trial against Vargas, but a second convicted. The contested issue in both trials was whether Vargas had knowledge of the marijuana in the trailer. The prosecution portrayed Vargas as the sole trafficker, with Garza merely lending Vargas his trailer, while Vargas contended that Garza used him to unwittingly haul the drugs.

The prosecution used circumstantial evidence to prove Vargas' knowledge. It showed the jury that the bill of lading volunteered by Vargas to border patrol agents at the checkpoint was fake. The document was a duplicate from a trip made by Garza's shipping company, Roadrunner Carriers, in 2006. Vargas had access to Garza's office where documents, such as bills of lading, were stored when he worked at the company in 2006. The duplicate had been doctored to show that the load originated at "Texas Wipes Rags"—a misspelling of one of Garza's frequent customers "Texas Wipers & Rags"—and was going to American Textile, Inc. in Tyler, Texas, a company that did not exist in that city. The bill also lacked details customary in the industry, such as a trailer number, freight weight, specification of the freight company, and contact information of the recipient.

Garza testified as a prosecution witness that on December 2, the day Vargas was arrested at the checkpoint, Vargas asked to borrow an empty trailer. At the time, Garza was on the road. He testified that he agreed and told Vargas to go to his yard and pick up any trailer he wanted.

Phone records indicate that Vargas also spoke with Garza shortly before he reached the checkpoint that same day. Vargas called a phone registered to Garza's wife at 10:24 p.m., which Garza was using that night. The two spoke for over forty minutes, ending the call approximately five minutes before Vargas reached the checkpoint. Prior to calling Garza, Vargas had called two numbers registered in Tyler, Texas and received a call back from one of the numbers.

Upon reaching the checkpoint, Vargas explained to agents that he was coming from Brownsville, Texas, was in route to Tyler, Texas, and that the trailer was loaded and sealed. He immediately volunteered the bill of lading. During the check, a drug detection dog alerted to the middle portion of the trailer. Border patrol agents searched the trailer, uncovering over 1,400 pounds of marijuana. Vargas was arrested and given *Miranda* warnings. He waived *Miranda* and, in response to questioning, stated that he had been working for P&M Trucking for seven months and that he had "just hooked up the trailer and left." He also said "I didn't know there was any drugs inside the trailer."

Before trial, the government argued that if Vargas did not testify at trial, his "self serving" statement should not reach the jury as he could not be cross-examined on it. The defense lawyer agreed, reserving the right to introduce the statement if it became relevant to complete a statement introduced by the prosecution. The court granted an in limine motion limiting the introduction of the statements.

In closing, the defense argued that Garza was the culprit who duped the unwitting Vargas into transporting the marijuana. The prosecution, after reviewing the trial evidence, replied:

> And what he chose to tell the Border Patrol, being charged with possession of marijuana, over a million dollars, a million dollars there at the checkpoint, it gets more valuable as it goes north, all he chose to say to them when he was asked some questions is saying, "I work for P&M, I've been there for seven or eight months, I picked it up and I was just going to drop it off."

She continued:

> It seems like he wants you to believe just that, that he did pick it up at P&M. Because he didn't say anything differently to the Border Patrol at that time, didn't say he went to Enrique's [Garza], "I got it from him." He never said that.

3

And:

> Everything he did on the night of his arrest says to you the defendant knew, because you never heard, "Enrique Garza did it, let me tell you about him." Wouldn't that be reasonable? Wouldn't that be the reasonable thing to say at that time?

The defense did not object to this argument. The prosecutor finished, the court read the jury its instructions, and within an hour it returned with a verdict of guilty.

## II

The defense urges prosecutorial misconduct: that the prosecutor's statements so tainted Vargas' trial as to make it unfair.[1] Vargas' fairness argument implicates due process. For a denial of constitutional due process, the prosecution's misconduct must so infect the trial as to substantially affect the fairness of the proceeding.[2]

We review the claim of misconduct in two steps. First, we determine whether the prosecutor's conduct, here the closing argument, was legally improper.[3] Having failed to object at trial, Vargas bears the burden of demonstrating that the prosecutor's statements constitute plain error.[4]

---

[1] One matter should be put aside. The defense only obliquely raises a second argument that the prosecutor's remarks inadmissibly commented on Vargas' post-arrest silence in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976). But Vargas was not silent. He answered several questions after the *Miranda* warnings had been given, making fair game both his answers and omissions: "A defendant cannot have it both ways. If he talks, what he says or omits is to be judged on its merits or demerits." *U.S. v. Fambro*, 526 F.3d 836, 842 (5th Cir. 2008) (quoting *Vitali v. U.S.*, 383 F.2d 121, 503 (1st Cir. 1967)). The question here is distinct: whether the prosecution committed misconduct by mischaracterizing evidence to the jury, implying silence when the question was answered.

[2] *U.S. v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008).

[3] *Id*.

[4] *U.S. v. Holmes*, 406 F.3d 337, 356 (5th Cir. 2005).

Second, if we find error in the prosecutor's statements, we reverse and remand for new trial only if the remarks "prejudiced the defendant's substantive rights," that is, where the error casts doubt on the correctness of the jury verdict.[5] This step overlaps with the third prong of plain error review.[6] In making this determination, we consider the magnitude of the prejudicial effect of the statements, the efficacy of any cautionary instructions, and the strength of the evidence of the defendant's guilt.[7]

### III

Vargas contests that the prosecution's closing argument asked the jury to infer his guilt on the fact that he did not offer an exculpatory explanation when he was arrested at the border checkpoint. Vargas had, in fact, denied knowledge of the drugs at that time in a statement the government successfully kept from evidence.

A prosecutor is confined in closing argument to discussing properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence.[8] If the government's closing argument questioned why Vargas did not deny knowledge of the drugs, it would have been plainly improper; a prosecutor may not argue the absence of evidence she well knew

---

[5] *Mendoza*, 522 F.3d at 491; *U.S. v. Jones*, 839 F.2d 1041, 1049 (5th Cir. 1988).

[6] "First, there must be an error or defect—some sort of 'deviation from a legal rule'—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it 'affected the outcome of the district court proceedings.' Fourth and finally, if the above three prongs are satisfied, the court of appeals has the discretion to remedy the error-discretion which ought to be exercised only if the error 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Puckett v. U.S.*, 129 S.Ct. 1423, 1429 (2009) (internal citations omitted).

[7] *Jones*, 839 F.2d at 1050.

[8] *Mendoza*, 522 F.3d at 491.

existed. The government, however, suggests the statements were made in response to the theory, first offered by the defense in its closing argument, that Vargas had been duped by Garza. If Garza was using the unwitting Vargas to haul drugs, as the defense argued, why would Vargas, when the drugs were unearthed, not say "Enrique Garza did it, let me tell you about him." Such an argument to counter the defense's theory of the evidence is within bounds.

But the record and the argument are a bit different. The prosecutor lingered on the point, making specific statements that could be read as implying Vargas made no exculpatory statements, when, in fact, he had. The prosecutor stated: "[A]ll he chose to say to them when he was asked some questions is saying, 'I work for P&M, I've been there for seven or eight months, I picked it up and I was just going to drop it off.'" But that was not *all* Vargas chose to say; he told the border officers "I didn't know there was any drugs inside the trailer." In a case where the single contested issue was Vargas' knowledge, and in which the prosecutor used a motion in limine to have Vargas' exculpatory statement excluded from evidence, the high ground would have been to steer clear of arguments that infer no such statement was made—especially when that argument was made only after the defense had had its last opportunity to exercise the right to introduce the statement should it become relevant. At best, if not ill-advised effort, it was a hazardous undertaking.

Yet, our review is for plain error, the second prong of which asks whether the error was clear or obvious. There are two possible readings of the prosecution's closing. Alone, the argument suggested no exculpatory statement was made, when the government knew it had. But in context of the argument, it answered the defense's theory of the case first raised in its closing. In light of these two possible readings, the remarks do not rise to the level of obvious error, evidenced in part by the absence of an objection by defense counsel whose competence is evident in this record.

IV

Even if, *arguendo*, it was obvious that the remarks were improper, Vargas also fails at the second step of our review of prosecutorial misconduct, corresponding here with the third prong of plain error review: the remarks did not affect the appellant's substantial rights, here the fundamental fairness of the trial. The statements were limited to a few moments of the trial, albeit in closing argument, and the jury had ample evidence on which to convict Vargas.

During its case-in-chief the prosecution never alluded to what Vargas did or did not say following his arrest. It only came up in response to a theory the defense first proposed in its own closing argument. These few moments of argument were made while that defense theory was still fresh in the jury's mind, making it likely the jury heard the arguments in that light. It signifies that denial of knowledge and the charges was implicit in the statements Vargas did make both when detained and at trial.

The government presented ample evidence at trial to support Vargas' conviction. The trial included multiple witnesses, including Garza, who testified that he knew nothing of the drugs and had offered Vargas an empty trailer on loan. Vargas was found hauling over 1,400 pounds of marijuana, had offered an obviously fake bill of lading despite his years of trucking experience, and made phone calls to the owner of the trailer just before reaching the check point. Any negative inference from the prosecution's closing remarks, and we think it small in the full setting of the trial, was outweighed by the evidence of Vargas' guilt. Perhaps the remarks made the trial imperfect, but it was fair.

AFFIRMED.